RECORD NO. 11-4129

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

―――――――――

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JONATHAN LEIGH SULLIVAN,

*Defendant-Appellant.*

―――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT NEW BERN

―――――――――

**OPENING BRIEF OF APPELLANT
JONATHAN LEIGH SULLIVAN**

―――――――――

Marilyn G. Ozer
MASSENGALE & OZER
211 North Columbia Street
Chapel Hill, North Carolina 27514
(919) 967-8555
redwood@nc.rr.com

*Counsel for Appellant*                        June 8, 2011

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ......................................................... iii

JURISDICTIONAL STATEMENT ................................................ 1

ISSUES PRESENTED .................................................................. 2

STATEMENT OF THE CASE....................................................... 2

STATEMENT OF THE FACTS .................................................... 3

    A.    Chargeable Images Were Discovered On Defendant's Digital Camera, Bu No Pornographic Images Were Found On Any Of The Defendant's Computers, Hard Drives Or CD's ................................................................ 3

    B.    After Being Allowed To View The Photographs In The Courtroom, Sullivan Changed His Plea To Guilty On All Counts ................................................................ 6

SUMMARY OF ARGUMENTS ................................................... 8

ARGUMENT .......................................................................... 8

I.  **FAILING TO REQUEST AN OPPORTUNITY FOR THE DEFENDANT TO VIEW THE IMAGES PRIOR TO THE BEGINNING OF THE TRIAL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL**........................... 9

    A.  Defendants Have A Statutory And Constitutional Right To View The Images Which Form The Basis Of The Indicted Charges .................................................... 10

    B.  The Events During The Trial Indicate Sullivan Would Have Entered Guilty Pleas In A Timely Fashion If His Counsel Had Requested An Opportunity To Allow His Client An Opportunity To View The Images Prior To His Arraignment ........................................................ 13

    C.  Medical Groups Have Issued Statements Which Support The Phenomenon Of Dissociative Memory .............................. 17

    D.  Defense Counse Had A Duty To Secure His Client's Right To View The Images And, Thus, Be Fully Informed Before His Arraignment ............................................ 19

CONCLUSION ...................................................................... 20

STATEMENT REGARDING ORAL ARGUMENT ................................... 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Commonwealth v. Shanley*, 919 N.E.2d 1254 (Mass. 2010) ............................... 18

*Griffin v. Warden*, 970 F.2d 1355 (4th Cir. 1992) .................................................9

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................9, 10, 19

*United States v. King*, 119 F.3d 290 (4th Cir. 1997) ........................................... 10

*United States v. Knellinger*, 471 F.Supp.2d 640 (E.D.VA. 2007) ................. 12, 13

*United States v. Shrake*, 515 F.3d 743, 746 (7th Cir. 2008) ................................ 13

*United States v. Spivack*, 528 F.Supp.2d 103 (E.D.N.Y. 2007) ........................... 13

*United States v. Wright*, 625 F.3d 583 (9th Cir. 2010) ......................................... 13

**Statutes**

18, U.S.C. § 2252(a)(4)(B) ......................................................................................2

18, U.S.C. § 2251(a) ...............................................................................................2

18, U.S.C. § 2251(d) ...............................................................................................2

18, U.S.C. § 2252(a)(4)(B) ......................................................................................2

18, U.S.C. § 2251(a) ...............................................................................................2

18 U.S.C. § 3231 .....................................................................................................1

18 U.S.C. § 3509(m) ......................................................................................*passim*

28 U.S.C. § 1291 .....................................................................................................1

**Other Authorities**

U.S.S.G. §3E1.1(b) ..................................................................................................9

**Rules**

Fed. R. Crim. P. 16 ........................................................................... 12

**Treatises**

ABA STANDARDS FOR CRIMINAL JUSTICE, DEFENSE FUNCTION ............................... 19

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS
    (4th Ed. Text Revision, 2000) ................................................... 18

Lynn Holdsworth, *Is It Repressed Memory With Delayed Recall
    Or Is It False Memory Syndrome? The Controversy And its
    Potential legal Implications,* 22 LAW & PSYCHOLOGY
    REVIEW 103 (Spring 1998) ..................................................... 17

**Constitutional Provisions**

U.S. Const. Amend. VI .................................................................. 8, 20

## JURISDICTIONAL STATEMENT

### Subject Matter Jurisdiction in the District Court

The basis for subject matter jurisdiction in the District Court is 18 U.S.C. § 3231, which states in pertinent part that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." *Id*. On October 14, 2009, Jonathan Leigh Sullivan was charged in a federal indictment.

### Appellate Jurisdiction

The basis for appellate jurisdiction is 28 U.S.C. § 1291, which states in pertinent part that the federal Courts of Appeal shall have jurisdiction of appeals from all final decisions of the federal District Courts except where the Supreme Court affords direct review. Final judgment for Jonathan Leigh Sullivan was entered on January 21, 2011 disposing of all claims.

Notice of appeal was timely filed on February 1, 2011.

1

## ISSUES PRESENTED

I.   Jonathan Sullivan's trial attorney provided ineffective assistance of counsel by failing to request an opportunity for the defendant to view the images, under the provisions of 18 U.S.C. § 3509(m), before the trial.

## STATEMENT OF THE CASE

On October 14, 2009, a twelve-count indictment was filed in the Eastern District of North Carolina against Jonathan Leigh Sullivan. Counts One through Eleven charged violations of Title 18, United States Code, Sections 2251(a) and (d), manufacture of child pornography on or about June 22, 2009. Count Twelve charged a violation of Title 18, United States Code, Section 2252(a)(4)(B), possession of child pornography.

On August 9, 2010, a jury was impaneled and the Government began presentation of its evidence. On August 10, 2010, while the Government was still presenting its case, the defendant indicated to the court that he wished to change his plea. (J.A. p. 229) After a Rule 11 colloquy, the defendant plead guilty to all counts. (J.A. pp. 243-244)

A sentencing hearing was held on January 21, 2011. The district court sentenced Jonathan Sullivan to 340 months on Counts 1 through 11, and a term of

120 months on Count 12, to be served concurrently. (J.A. pp. 283) A Notice of

Appeal was timely filed on February 1, 2011. (J.A. p. 294)

## STATEMENT OF THE FACTS

A.  Chargeable Images Were Discovered On Defendant's Digital
Camera, But No Pornographic Images Were Found On Any Of The
Defendant's Computers, Hard Drives Or CD's

Deputy Harry Meyer of the Wake County Sheriff's Department was on his

way to his home in the Eagle Ridge Golf Community in Garner on the afternoon of

June 22, 2009 when he noticed a silver Toyota 4Runner parked in an undeveloped

cul-de-sac. (J.A. pp. 87, 89) Meyer decided to investigate. As Meyer approached

he could see an adult in the car, later identified as Jonathan Sullivan, and a small

child sleeping in a car seat. (J.A. 93-94, 96) Meyer asked Sullivan what he was

doing in the cul-de-sac. Sullivan told him he was trying to sleep. (J.A. 97) While

he waited for back-up, Meyer checked on the child in the car seat. He noticed a

digital camera sitting next to the car seat. (J.A. pp. 99-100)

Officer Guy Edwin White of the Garner Police Department pulled up as

Meyer was talking with Sullivan. Meyer turned the investigation over to White.

(J.A. pp. 101, 107) Sullivan told Meyer he had just dropped off his daughter to

play with a friend at her house. (J.A. p. 107) Sullivan said the child in the car seat

3

was his girlfriend's son. (J.A. p. 108) Sullivan at first denied owning the camera, but then admitted it was his. After Sullivan allowed White to look at the images on the camera, White realized that the images were of an undressed female. Some of the photos were of the upper half of her body, with her face covered. Other images were of genitalia. (J.A. p. 110-112) White mentioned to Sullivan that if the pictures were of a consenting female adult, there was nothing wrong. In response Sullivan told the officer the photos were of an adult he had met passing by the road. (J.A. p. 115) The Government made a notebook containing prints of the images for each of the jurors to view. The notebooks were passed to the jurors after White had identified the images. (J.A. p. 112)

Officer Petro Alexander Moore of the Garner Police Department arrived while White was questioning Sullivan about images on the digital camera. (J.A. p. 116) When the officers went to check on the child in the car seat, Moore observed something moving under the tarp in the back of the 4Runner. (J.A. p. 117) When Moore lifted the tarp he saw a young girl: "She popped up and she was pulling down her dress." (J.A. p. 68) Moore had been on the scene approximately 10 to 15 minutes prior to the discovery of the girl. Sullivan said he didn't know anybody was back there and that he did not know the girl. After Moore questioned him further, Sullivan stated it was his daughter and he didn't know how she got in the

back of the trunk. (J.A. p. 122) Moore later identified the girl in the photographs to be the girl in the back of the car. Sullivan was taken to the Garner police station, where he was arrested on state charges. (J.A. pp. 125-126) The interrogation of Sullivan was video recorded. The Government played the video for the jury. (J.A. p. 140) Sullivan told the officer that the photographs were only to be seen by himself and the victim, that he never touched the victim while he was taking the photos and that he was not sexually attracted to the victim. (J.A. p. 145)

Special Agent Eric Hooks of the State Bureau of Investigation task force on Internet Crimes Against Children examined six computers found at Sullivan's home, numerous CD's and DVD's and several hard drives that were sitting around. No child pornography was found on the computers, hard drives or other media. (J.A. pp. 170, 213) He also examined the Canon Power Shot digital Camera that was found in the 4Runner. (J.A. p. 171) The photographs that had been introduced in to evidence were taken on June 22, 2009 from approximately 4:10 to 4:30 p.m. (J.A. pp. 176, 216)

Theresa Dillard testified she was the grandmother and primary caretaker of the victim. (J.A. p. 220) Dillard and Sullivan met online in October 2004. In January 2005, Sullivan travelled to Georgia where Dillard was living. (J.A. p. 221) In October 2005, Dillard moved to North Carolina with her grandchildren to live

5

with Sullivan. (J.A. p. 222) After Sullivan's arrest, Dillard and the children moved back to Georgia. (J.A. p. 225) While they lived together Sullivan was the sole support for the family. (J.A. p. 226)

B.   After Being Allowed To View The Photographs In The Courtroom Sullivan Changed His Plea To Guilty On All Counts

At the October 4, 2010 pre-trial hearing, the Government informed the court that rather than putting images of child pornography up on screens, they had prepared individual notebooks, each containing prints of the images which were the basis of the indictment, to be passed to the jurors, the court, the witness and defense counsel. (J.A. p. 43) All the notebooks were to be turned back in to the government after the trial and destroyed. (J.A. p. 45) The notebooks were passed out and the photographs identified for the jurors during the testimony of Officer White. (J.A. pp. 110-112) The photographs were then admitted into evidence. (J.A. p. 112)

After the photographs had been introduced, defense counsel approached the bench and alerted the court that this was the first time the defendant had seen the prints. (J.A. pp. 113, 203) Defense counsel told the court a problem had arisen with his stipulation to the images, as the defendant now believed the prints had been altered and doctored and were not taken inside of his vehicle. (J.A. pp. 135-136)

6

After a brief recess, the Government told the court that the issues had been worked out. (J.A. p. 136) At the end of the day, the court asked the defense counsel if the defense still stipulated to the photographs. Defense counsel conferred with his client and responded they were in agreement with the stipulations that were previously entered. (J.A. p. 179)

The next morning, defense counsel informed the court the defendant was now claiming he did not take some of the photographs. (J.A. p. 198) The court sent the jurors to the jury room, so that defense counsel could go over the photographs with his client again. (J.A. p.199) After the defendant had reviewed the photographs in the courtroom, counsel told the court Mr. Sullivan would stipulate to Exhibits 7 through 19[1], but not Exhibits 1 through 6. Counsel explained as his client had not seen the photographs until the first day of trial, this was an issue of surprise. The defendant was now adamant that the prints stipulated to were not images that he had taken. (J.A. p. 204) The court ruled the matter would be held in abeyance. The Government continued presentation of witnesses. (J.A. pp. 209-210)

After Theresa Dillard's testimony, the court took a ten-minute recess to give defense counsel an opportunity to confer with his client. (J.A. p. 38) When court

---

[1] Exhibits 12 through 19 were photographs of "a female, upper body portion, including the breasts, with something covering her face." (J.A. p. 112) These eight photographs were not included in the indictment.

7

was called back in to session, defense counsel announced that the defendant wished to change his plea in the case. (J.A. pp. 228-229) When asked if he were satisfied with his counsel, Sullivan responded he was except for a lack of communication on exactly what was on the photos. (J.A. p. 232) The court ordered the defendant be given a notebook again and take time to go over all the prints once more. After Sullivan had re-examined the prints, the court continued the Rule 11 colloquy. (J.A. p. 234) Sullivan responded guilty to each of the twelve counts. (J.A. pp. 243-244, 248) The court accepted the plea and adjudged him guilty as to each count. (J.A. p. 255)

## SUMMARY OF ARGUMENTS

### Issue I.

The failure of Mr. Sullivan's counsel to request an opportunity for his client to view the images prior to the commencement of the trial constituted ineffective assistance of counsel under the Sixth Amendment.

## ARGUMENT

**I. FAILING TO REQUEST AN OPPORTUNITY FOR THE DEFENDANT TO VIEW THE IMAGES PRIOR TO THE BEGINNING OF THE TRIAL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL**

Standard of Review.

Ineffective assistance of counsel is a mixed question of law and fact that is reviewed de novo. *Strickland v. Washington*, 466 U.S. 668, 698 (1984); *Griffin v. Warden*, 970 F.2d 1355, 1357 (4th Cir. 1992)

Discussion of the Issue.

Jonathan Sullivan entered guilty pleas to all counts shortly after having had an opportunity to view prints of the images taken from his camera on June 23, 2009. He explained to the court that he had not remembered the content of the photographs. Having studied the prints of the digital images, Sullivan admitted guilt. If he had been shown the prints before his arraignment or at a time considered by the Government to be a timely notification of his intention to enter a plea of guilty, Sullivan's guideline sentence would have been reduced by at least three levels for acceptance of responsibility. U.S.S.G. §3E1.1(b). As his criminal history category was I and the offense level 41, a reduction of three levels would

9

have reduced the guideline recommendation from 324-405 months to 235-293 months (approximately seven to nine years).

According to this Court's precedent, claims of ineffective assistance of counsel should not be brought on direct appeal, unless it "conclusively appears" from the record that the defense counsel did not provide effective representation. *United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997). Mr. Sullivan's situation is distinguishable from this Court's precedent on ineffective assistance claims as trial counsel noted on the record that his failure to seek an opportunity for his client to view the photographs may have been error on his part and he "accepted responsibility for this." (J.A. p. 207) In addition, the Government stated if counsel had asked, arrangements would have been made for Mr. Sullivan to view the images. (J.A. p. 206)

A defendant claiming ineffective assistance must show that "(1) his counsel's performance fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 688, 694. Had Mr. Sullivan been allowed to view the images shortly after his indictment on federal charges, there is more than a reasonable probability that he would have

10

entered guilty pleas at his arraignment. This is supported by the fact that after Mr. Sullivan was given the opportunity to view and inspect the prints of the images in the courtroom and was given time to confer with his counsel while looking at the prints, he did change his plea to guilty. If Mr. Sullivan had accepted responsibility in a timely fashion, he would have been eligible for a three level guideline reduction, rendering a different result to the proceeding.

A.    Defendants Have A Statutory And Constitutional Right To View The Images Which Form The Basis Of The Indicted Charges

The Adam Walsh Child Protection And Safety Act was signed by President George W. Bush on July 27, 2006. One of the provisions of this act is that the government must remain in possession of child pornography seized in connection with the offense, and the court can deny a defendant's request for duplicating the evidence "so long as the Government makes the property or material reasonably available to the defendant." Material is "reasonably available" if the Government "provides ample opportunity for inspection, viewing, and examination at a Government facility of the property or material by the defendant, his or her attorney, and any individual the defendant may seek to qualify to furnish expert testimony at trial." 18 U.S.C. § 3509(m)(2)(B). Before the Adam Walsh Act,

11

defendants could move to obtain copies of the images under Rule 16 of the Federal Rules of Criminal Procedure.

After the passage of the act, different means were developed for providing the defendant with an opportunity for inspecting or viewing the images. A district court in Virginia issued one of the first rulings on the act. *United States v. Knellinger*, 471 F.Supp.2d 640 (E.D.VA. 2007). *Knellinger* raised a challenge to the constitutionality of 18 U.S.C. § 3509(m). The court asked the parties to brief the issue and invited amicus briefs from the National Association of Criminal Defense Lawyers, the Federal Public Defender and the University of Richmond Law School and held an evidentiary hearing on the issue. *Id*. at 642. After the hearing, the court ruled the defendant had a right under the statute for an ample opportunity to examine, view, and inspect the hard drive. The court reasoned that as defendants may obtain, by court order, copies of child pornography when the United States cannot provide an ample opportunity for inspection, viewing, and examination at a government facility, § 3509(m) is not an absolute prohibition on copying child pornography for inspection outside a government facility. *Id*. at 649. To comply with the statute, the Government was ordered to supply Knellinger's defense team with a mirror image copy of Knellinger's hard drive, if counsel for Kenellinger certified to the Court that the copy would be used for the assessment

or presentation of a defense. *Id*. at 650. Other courts have held, to satisfy the

"ample opportunity" requirements of the statue, the government must either give

the defense team due process level access to the hard drive at a government

facility, or the government must give the defense team a copy of the hard drive.

*See e.g.*, *United States v. Wright*, 625 F.3d 583, 616-617 (9th Cir. 2010); *United

States v. Shrake*, 515 F.3d 743, 746 (7th Cir. 2008); *United States v. Spivack*, 528

F.Supp.2d 103, 106-107 (E.D.N.Y. 2007). Based on the statute and the case law,

Sullivan had a statutory and constitutional right to view the images.

B.  <u>The Events During The Trial Indicate Sullivan Would Have Entered
    Guilty Pleas In A Timely Fashion If His Counsel Had Requested An
    Opportunity To Allow His Client An Opportunity To View The
    Images Prior To His Arraignment</u>

During the plea colloquy, Mr. Sullivan explained that while he didn't

remember taking photographs depicting sexual touching, once he saw the

photographs he realized the pictures told a different story.

> THE DEFENDANT: I'm pleading guilty because, as far as I can tell, I
> can't – I can't deal with the evidence. The evidence basically is telling
> me -- I didn't look at the pictures. I didn't see the pictures. I don't
> know what I took pictures of. I don't remember any of the activities
> that are going on that the pictures say that happened. But as far as I
> can tell, the evidence is telling me that I'm guilty and that the only
> reason why I have no choice but to plead guilty, even though I have
> no memory or recollection of those pictures.

*            *            *

13

> I do not feel I was sexually trying to do anything. I don't believe that there was enough sex, yet the pictures clearly stated that that's truly what was going on.

(J.A. pp. 246-247)

After Mr. Sullivan had viewed copies of the prints, counsel notified the court that he wished to withdraw defense stipulations to the Government's exhibits. Defense counsel explained to the court that while he himself had viewed the images, his client had not had an opportunity to see the pictures: "The defendant, other than the day of this alleged incident on June 22nd, looking at them on the viewfinder of this digital camera, had no opportunity to view the exhibits." (J.A. p. 134) When counsel described the images to his client, Mr. Sullivan was willing to stipulate, but felt differently when he actually saw the photographs. "But when the government introduced the pictures and we had the opportunity to see them, it's his contention now that they have been altered and doctored and that they are not, in fact, pictures from the interior of the sports utility vehicle." (J.A. p. 134) By the end of the evidence on the first day, Mr. Sullivan was again willing to stipulate to the photographs. (J.A. p. 179)

The next morning, defense counsel informed the court that his client had changed his mind: "When the defendant saw these photographs at trial, he's now claiming that he did not take some of these photographs." Counsel explained to the

14

court that he needed to go over the photographs with his client because he did not

have access to the exhibits during the overnight recess. The court told defense

counsel: "We could have made that opportunity available if we had known." (J.A.

p. 198) A recess was called, while counsel and the defendant examined the

photographs again. After going over the photographs, defense counsel informed

the court that the defendant would stipulate to Exhibits 7 through 19, but not

Exhibits 1 through 6. (J.A. pp. 201-202) The court advised defense counsel that he

"could have done some things to have gotten ahold of these sooner." (J.A. p. 203)

The prosecutor confirmed he would have done whatever was necessary to allow

the defendant to view the images pretrial:

> MR. EXUM:        That's right. That's 3509(m). And, your Honor, we
> have never received nor refused a request from defense counsel
> to do anything with these images. We would certainly be
> prepared to arrange whatever might be necessary to—to—you
> know, let defense counsel do whatever they feel is necessary.

(J.A. p. 206) When the court asked how the Government would have responded to

a request to allow the defendant to see the pictures, the prosecutor explained:

> MR. EXUM:        We would have found a way to present them to the
> defendant in some sanitized fashion to secure the images and
> make sure that he was able to prepare with them by whatever
> means necessary.

(J.A. 206) Defense counsel responded that failure to request an opportunity for Mr.

Sullivan to view the photographs may have been error:

MR. WILLIS:    Your Honor, the government gave me the opportunity to view the images, and I viewed the images early on in this case and discussed them with my client as best I could.

I would say for the record, I strongly urged my client, based on the images I saw, to accept the government's plea offer. And this may have been an error on my part. I accept responsibility for this.

(J.A. p. 207) (*emphasis added*)

After this exchange the court ruled it would hold the matter in abeyance. The Government then called Special Agent Eric Hicks to the stand to complete his testimony followed by Theresa Dillard, the grandmother of the victim. The jury was sent out in order to allow the court to hear further argument concerning withdrawal of part of the stipulation. Defense counsel asked for a moment to speak with his client. After a ten minute recess, defense counsel announced that Mr. Sullivan wished to change his plea. (J.A. pp. 228-229) During the Rule 11 colloquy, Mr. Sullivan indicated he was satisfied with the services of his attorney, except for "a lack of communication on exactly what was on the photos." (J.A. p. 232) He explained his confusion was the result of three factors: 1) this was the first time he had seen the photos; 2) he thought he knew what was on the photos; and 3) he had assumed they were all okay. Once he had seen the prints, he realized his memory was incorrect.

16

THE DEFENDANT:    I had no idea – I don't remember her ever touching herself. I don't remember her ever doing any of that, except to say she did, until I actually got the pictures.

That's why, at first, I was confused. But then, once I actually saw the scene, that the evidence inside the pictures was proving otherwise. I guess my mind just lost it. Because I've contended from the beginning that she's never touched herself; that she was laying in a certain position the whole time – two positions the whole time, and that's it.

And when I got the evidence, it showed something totally different. And it totally – I don't know. I just --.

(J.A. pp. 232-233) Before going forward with the Rule 11 proceeding, the court instructed the Government to give the defendant a notebook of with the prints and told the defendant to make sure he had seen all of the images and inspected them. (J.A. p. 233) After Mr. Sullivan had reviewed the photographs once more, the court proceeded with the Rule 11 hearing.

C.  Medical Groups Have Issued Statements Which Support The Phenomenon Of Dissociative Memory

Repression is a term used "by psychologists to refer to the process of burying memories of painful or traumatic experiences in order to block the anxiety the memory evokes." Lynn Holdsworth, *Is It Repressed Memory With Delayed Recall Or Is It False Memory Syndrome? The Controversy And its Potential legal Implications,* 22 LAW & PSYCHOLOGY REVIEW 103, 105 (Spring 1998) A high degree of stress may impair the accuracy of the memory to be impaired. *Id*. at 115.

Courts have accepted the psychological phenomenon of dissociated memory. For example, in Massachusetts expert testimony on dissociative memory has been found admissible. The court noted dissociative amnesia is listed as a diagnosis in DSM-IV[2] and "both the American Medical Association and the American Psychiatry Association" have issued statements that "memories of traumatic events can be forgotten but that pseudomemory formation is also possible." *Commenwealth v. Shanley*, 919 N.E.2d 1254, 1265-1266 (Mass. 2010)

Deputy Meyer seems to have interrupted Mr. Sullivan, while Mr. Sullivan was engaged in taking the photographs.[3] Mr. Sullivan was immediately taken in to custody. It is possible given the stress of the questioning and arrest so soon after taking the photos, that the defendant's mind repressed details. As discussed in court, Mr. Sullivan did not have an opportunity to see the images prior to trial, other than in the viewfinder of the digital camera at the time of his arrest. (J.A. p. 115) The Government did not proffer a counter explanation to the court for Mr. Sullivan's unexpected reaction to his first opportunity to examine the prints.

---

[2] DSM-IV-TR includes under Dissociative Amnesia, "localized amnesia", which occurs when an individual "fails to recall events that occurred during a circumscribed period of time." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, p. 520 (4th Ed. Text Revision, 2000)

[3] Trial testimony indicated that Deputy Meyer first saw Mr. Sullivan leaning over the back seat. (J.A. p. 94) Officer Moore testified that the victim was dressing when he removed the tarp. (J.A. p. 68)

18

### D. Defense Counsel Had A Duty To Secure His Client's Right To View The Images And, Thus, Be Fully Informed Of The Case Against Him Before His Arraignment

The American Bar Association Standards For Criminal Justice hold that "important rights of the accused can be protected and preserved only by prompt legal action." The standard goes on to explain: "Defense counsel should consider all procedural steps which in good faith may be taken." ABA Standard Defense Function, Part I. General Standards 4-3.6. In this case counsel failed to consider his client's need to actually see the prints in order to fully comprehend the Government's evidence concerning his actions. Having knowledge of the Government's exhibits was fundamental to an informed decision to plead guilty or innocent. By failing to request that Mr. Sullivan be allowed to view and inspect the images, as permitted by U.S.S.G. § 3509(m), trial counsel provided ineffective assistance of counsel. Mr. Sullivan's guideline sentence would have been reduced by three levels if he had plead guilty prior to trial, resulting in a guideline sentence recommendation reduction approximately seven to nine years lower than the sentence he received. The defense counsel's failure to request that the Government provide Mr. Sullivan access to the prints before his arraignment rendered a different result to the proceeding. Trial counsel's failure to protect his client's statutory and constitutional right to be fully informed of the evidence prior to

entering his plea constitutes ineffective performance in violation of the Sixth Amendment under the *Strickland v. Washington* guidelines.

Relief Requested

Mr. Sullivan changed his plea to guilty after he had had an opportunity to view and consider the import of the prints of the images. If he had been shown the images prior to arraignment and had plead guilty at that time, his guideline sentence would have been three levels lower. Jonathan Sullivan's conviction and sentence must be vacated based on constitutionally ineffective assistance of counsel.

## **CONCLUSION**

For the reasons given above, counsel for defendant petitions this Court to vacate Defendant's conviction and sentence and for any other such relief that the court may deem just and proper.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant does not request oral argument unless the Court believes such argument would aid the decisional process.

Respectfully submitted, this the 8th day of June 2011.

/s/ Marilyn G. Ozer
N.C. Bar # 18360
Massengale & Ozer
211 North Columbia Street
Chapel Hill, NC 27514
(919) 967-8555
redwood@nc.rr.com

21

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. _____          Caption: _____

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or
32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may
not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500
words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count
may be used only with monospaced type]*

[ ]    this brief contains _____ [*state the number of*] words, excluding the parts
of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state the number
of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type
style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times;
12-point font must be used with monospaced typeface, such as Courier or Courier New]*

[ ]    this brief has been prepared in a proportionally spaced typeface using _____
_____ [*state name and version of word processing program*] in _____
_____ [*state font size and name of the type style*]; or

[ ]    this brief has been prepared in a monospaced typeface using _____
_____ [*state name and version of word processing program*] with _____
_____ [*state number of characters per inch and name of type style*].

(s)_____

Attorney for _____

Dated: _____

CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2011, the foregoing Opening Brief of Appellant was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit via hand delivery and electronically using the CM/ECF system, which will send notification of such filing to:

Jennifer P. May-Parker
Office Of The United State Attorney
Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
(919) 856-4530

I hereby certify that on June 8, 2011, a copy of the foregoing Brief of Appellant and Joint Appendix was served via U.S. Mail, First Class, postage paid to Counsel for Appellee at the address listed above.

　/s/*May Serafim*　
May Serafim
Lantagne Legal Printing
801 East Main Street, Suite 100
Richmond, Virginia 23219